J-A19044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AMEER MURPHY | : | |
| | : | |
| Appellant | : | No. 1301 EDA 2018 |

Appeal from the Judgment of Sentence April 6, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005908-2015


BEFORE:   PANELLA, P.J., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                **FILED OCTOBER 21, 2019**

Appellant Ameer Murphy appeals the judgment of sentence entered by

the Court of Common Pleas of Philadelphia County after a jury convicted

Appellant of first-degree murder, conspiracy to commit murder, possession of

an instrument of crime and two violations of the Uniform Firearms Act (VUFA).

Appellant claims the trial court erred in allowing the Commonwealth to admit

the prior statement of a prosecution witness.  After careful review, we affirm.

The trial court aptly summarized the factual background of the case as

follows:

> On March 16, 2015, just before 10:00 p.m., Leon Williams
> sat on his porch at 6053 Irving Street in West Philadelphia,
> between 60th and 61st Streets.  As he sat on the porch smoking
> cigarettes, he noticed his nephew, the decedent Marquan Royster,
> approaching him from the opposite side of Irving Street via 61st
> Street.  After Williams called out, "Hey Nephew!" to the decedent,
> [Appellant], Ameer Murphy, and an unidentified individual walked
> onto the block from 61st Street and started following the decedent.

_____

*   Former Justice specially assigned to the Superior Court.

In response, the decedent began to jog away from the pair. After the three passed Williams' home, [Appellant] and his accomplice drew laser-sighted pistols and fired what Williams thought was three to four shots at the decedent in the middle of the street. As the decedent lay dying, [Appellant] and his accomplice turned around, ran past Williams' house for a second time, entered a red vehicle parked on 61st Street, and drove away. Williams saw [Appellant's] face after [Appellant] passed by the home for a second time.

From his living room at 6052 Irving Street, across the street from Williams' home, Norman Gay heard gunfire as he watched television. After going onto his porch to investigate, Gay observed [Appellant] and his co-conspirator, wearing sweatshirts and hoodies, run towards his house from the middle of the street to the near sidewalk, carrying laser-sighted pistols in their hands. As he ran past Gay's home, [Appellant's] hood came off his head, permitting Gay to observe his face as he approached and ran under a streetlight. After [Appellant] reached the front stairs onto Gay's porch, Gay's wife pulled him inside the home. Minutes later, Gay returned to the porch and observed a crowd in the middle of the street.

At 9:54 p.m., Philadelphia Police Officer Gary Mercando and Sergeant Mirriam Joseph received a radio call for a shooting near 60th and Irving Streets. Upon arrival, the officers worked their way through a crowd of about eight people to the decedent's body, which lay face down in the middle of Irvine Street. After discovering that the decedent was non-responsive, the officers carried him into the back of their squad car and drove him to Presbyterian Hospital, where he was pronounced dead.

Dr. Edwin Lieberman, a forensic pathologist formerly with the Philadelphia Medical Examiner's Office, performed the decedent's autopsy and generated a report. The decedent suffered two gunshot wounds, including a perforating gunshot wound to the rear-left side of his head, which was immediately fatal, and a perforating gunshot wound to his right shin. Each gunshot wound was consistent with the decedent running away from his assailants. Assistant Medical Examiner Dr. Khalil Wardak, an expert in forensic pathology, conducted an independent review of Dr. Lieberman's report and photographs associated with the instant offense. At trial, Dr. Wardak testified, to a reasonable degree of medical certainty, that [the] manner of death of homicide, caused by a gunshot to the back of the head.

Officer Michael Lombardi arrived at Irving Street shortly after the shooting and secured the area. There, he discovered five fired cartridge casings ("FCCs") on the street. The Philadelphia crime scene unit ultimately recovered three .380 caliber FCCs and four .45 caliber FCCs and one .30 caliber [sic] and .45 projectile, respectively. Ann Marie Barnes, an expert in ballistics, reviewed the ballistics recovered from the scene and determined that each .380 caliber FCC and each .45 caliber FCC were fired from the same weapon for each respective caliber.

Homicide detectives Frank Mullen and Thorsten Lucke recovered a surveillance video from the Baez Grocery Store on 61st Street near the scene of the shooting. While the video did not show the shooting itself, it does show a red vehicle parking near Irving Street before the shooting, and the decedent walking out of the store immediately prior to the shooting.

At approximately 11:37 p.m. on March 16, 2015, [Appellant] arrived at the Camden Medical Center in Camden, New Jersey suffering from a gunshot wound to the foot. After he arrived, Officer Jeffrey Kostopolis of the Camden City Police Department interviewed [Appellant], who identified himself as Quateer Brown, and gave an address of 3133 Tasker Street in South Philadelphia. At the hospital, [Appellant] explained that he was waiting for his paramour Jevana Robinson at 4th and Erie Streets in Camden where he was shot in the foot and after which Robinson drove him to the hospital. Camden City Police investigated the area around 4th and Erie and discovered no evidence of a shooting.

In March 2015, Philadelphia homicide detectives received information identifying a phone number associated with [Appellant]. Detective John Verrecchio prepared a search warrant for the phone number (215) 251-3547, associated with [Appellant] and on March 31, 2015, Detective Verrecchio received the cell phone records. Detective Thorsten Lucke also reviewed the records and discovered that at 7:15 p.m. on March 16, 2016, the user of the cell phone texted an unidentified contact, "This is Meer Meer." The phone further contained selfies of [Appellant] and a photo of [Appellant] in the hospital with a foot wound. The internet search history of the phone also revealed that the user, on March 17, 2015, searched for a news article concerning the instant shooting. The Phone's user history was further littered with images of dirt bikes and pornographic videos.

At 6:00 a.m. on April 1, 2015, Philadelphia police officers obtained and executed a search warrant for [Appellant's] home at 3138 Tasker Street in South Philadelphia. There, officers recovered the iPhone 5c associated with the (215) 251-3547 number and detained [Appellant] to question him at the homicide unit within the Police Administration Building. That morning, homicide detective Thomas Gaul *Mirandized* and interviewed [Appellant], who gave detectives consent to search the phone.

During the interview, [Appellant] denied any involvement in the homicide, but explained to the detective that the decedent was killed in retaliation for the murder of his best friend Damien James. [Appellant] further claimed that he shot himself on the corner of 25th and Moore Streets in South Philadelphia, that he went to Camden, New Jersey for medical treatment, and gave doctors a fake name while he was there, but did not explain why. Detective Gaul examined police reports for that night and discovered a complaint about two males who were shot [] on the 1600 block of South Taylor Street in South Philadelphia.

At 8:00 p.m. that evening, Detective Verrecchio re-*Mirandized* [Appellant] and conducted a second interview. Then, [Appellant] described how he was in South Philadelphia at the time of the shooting, and that there was an ongoing conflict between a group of males from 20th Street against a group from 24th Street. [Appellant] identified himself as a member of the 20th Street group, and described the decedent as a member of the opposing faction. James, whose death [Appellant] described as a catalyst for the conflict between the groups and the instant shooting, was a member of the 20th Street group with [Appellant].

Before the interview, Detective Verrecchio examined the phone records for the 3547 number, which contained geolocation information for each phone call. By entering the coordinates into a Google Maps search, Detective Verrecchio was able to create a map for each phone call, demonstrating that the user was in West Philadelphia near the 61st and Irving Streets at the time of the shooting. When Detective [Verrecchio] confronted [Appellant] with this map during the interview, [Appellant] exclaimed that "[his] life [was] over," and asked Detective Verrecchio if he could take the whole case himself without naming any other associates. After further questioning, [Appellant] refused to sign a written statement, but Detective Verrecchio prepared his own summary of the interview.

After [Appellant's] arrest, Detective James Dunlap, an expert in cell phone tower analysis, analyzed the records for the phone associated with [Appellant] and identified more than three dozen connections on March 16, 2015. Between 7:50 p.m. and 9:21 p.m., the phone associated with [Appellant] made seven connections at the tower located at 63rd and Walnut Streets, near the scene of the shooting. At 9:53 p.m., the phone associated with [Appellant] made a call from a different sector of the same tower. From 9:56 p.m. to 10:05 p.m., the phone travelled from a series of towers further west, connecting with towers in Upper Darby, Pennsylvania, the 6700 block of Baltimore Avenue in West Philadelphia, 58th and Springfield Streets, and on 67th and Essington Streets. By 10:19 p.m., the phone connected with a tower on Passyunk Avenue in South Philadelphia. Between 10:19 and 11:18, the phone connected with numerous towers in an area between Broad Street and Interstate 76 west east to west [sic] and from South Street down to Passyunk Avenue north to south. At 11:27 p.m., the phone connected with a tower in Camden, New Jersey, near the Camden Medical Center. At trial, Detective Dunlap testified that the time and location of the connections indicate that the use of the phone was in the area of the shooting at the time it occurred, and then was inside a vehicle that travelled between the identified towers.

At trial, [Appellant's] mother, Questina Woods, testified that the 3547 numbered phone belonged to her daughter, but that she was in possession of the phone on the evening of the shooting, and that the phone was in her possession while she was visiting a prospective new home at 57th and Hazel Avenue in West Philadelphia, blocks from where the shooting occurred. On cross-examination, when confronted about pornography discovered on the phone, Woods testified that she often used her phone to search for pornography, but could not explain answers to text messages identifying the user as "Meer Meer," [Appellant's] nickname.

[Appellant] elected to testify at trial and explained that he was at 24th and Morris Streets from 6:00 to 10:30 p.m. Then, while [Appellant] and his friend Lawrence Shiver sat in a Buick LeSabre, an unidentified vehicle pulled up next to them and fired into the passenger compartment, striking [Appellant] in the foot. After that shooting, [Appellant] went to Woods' home, and had her drive him to a hospital in Camden, New Jersey. [Appellant] elected to check into a New Jersey hospital and provided a pseudonym, he explained, because he feared being arrested for a

probation violation if he treated his wound in Philadelphia. [Appellant] further claimed that Woods had the 3547 numbered cell phone from 6:00 p.m. until his arrival at the Camden Medical Center.

Trial Court Opinion (T.C.O.), 6/21/18, at 2-7 (citations omitted).

At the conclusion of the trial, the jury convicted Appellant of the aforementioned charges on April 6, 2018. On the same date, the trial court imposed a mandatory minimum sentence of life imprisonment without parole on the first-degree murder charge. In addition to this life sentence, the trial court also imposed sentences of imprisonment for his conspiracy, PIC, and weapons charges. Appellant did not file a post-sentence motion.

On May 1, 2018, Appellant filed a timely notice of appeal. Thereafter, this appeal was dismissed twice for Appellant's failure to file a brief. After this Court reinstated the appeal on two occasions, Appellant filed a counseled brief raising one issue for review, claiming the trial court abused its discretion in allowing the Commonwealth to introduce a witness's prior written statement into evidence.

It is well-established that "[t]he admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion." **Commonwealth v. Le**, ___Pa.___, 208 A.3d 960, 970 (Pa. 2019) (citing **Commonwealth v. Reid**, 627 Pa. 151, 99 A.3d 470, 493 (2014)).

Specifically, Appellant claims the trial court abused its discretion in allowing the Commonwealth to admit Leon Williams' prior statement, which Appellant characterizes as a prior *consistent* statement, which improperly

bolstered Williams' credibility. In response, the Commonwealth asserts that the statement at issue was properly admitted as a prior *inconsistent* statement.

This Court has held that a prior inconsistent statement is admissible to impeach a witness if the statement was given under reliable circumstances and the witness is available for cross-examination. ***Commonwealth v. Enix***, 192 A.3d 78, 81–82 (Pa.Super. 2018). As noted above, Appellant does not suggest that Williams' prior statement to police was unreliable, but argues that it was not inconsistent with his trial testimony. We disagree.

At trial, the Commonwealth elicited the following testimony from Mr. Williams on direct examination:

> [Prosecutor:] To the best you can remember, can you describe this defendant and what he was wearing at that time?
>
> [Williams:] The one's that's in the courtroom with me now?
>
> [Prosecutor:] Yeah.
>
> [Williams:] Like a sweatshirt with a hood. It had like a hood on it. I don't know what kind of sweatsuit it was, partake, but it was a general sweatsuit. **It was a darker color**. That's all.
>
> [Prosecutor:] Okay. What about the other male?
>
> [Williams:] He had on, like, a same, similar outfit. Another hooded shirt or sweatsuit. But they were dressed similar.
>
> [Prosecutor:] Was one taller or shorter than the other?
>
> [Williams:] Yes.
>
> [Prosecutor:] Which one was this defendant?
>
> [Williams:] **The shorter one**.

Notes of Testimony (N.T.), 4/2/18, at 218-219 (emphasis added).

At that point, the prosecutor introduced the signed statement Williams gave to Philadelphia detectives after the shooting occurred. In this statement, Williams had indicated that the shooter was wearing a "light gray Nike sweatshirt with a zipped-up hood" and was the taller of the decedent's two assailants; Williams estimated that Appellant was 6'0'' or 6'1" in height. Commonwealth's Exhibit 3, at 3. Defense counsel objected, arguing that the prosecutor was "trying to rehabilitate her own witness." N.T., 4/2/18, at 221. The trial court overruled defense counsel's objection, indicating that the prosecutor was permitted to determine if Williams gave a different description of Appellant at some point. N.T., 4/2/18, at 222.

We agree with the trial court's finding that Williams' statement was admissible as a prior inconsistent statement. This conclusion is supported by the fact that defense counsel also attempted to use Williams' prior statement to impeach his credibility based on a conflicting description of Appellant's clothing and stature. N.T., 4/3/18, at 47; N.T., 4/5/18, at 191-93.

Moreover, even assuming *arguendo* that the trial court improperly admitted this statement, any resulting error would have been harmless.

> Even where the trial court erroneously admitted evidence, this Court may still sustain the verdict if it finds the error harmless. **See Commonwealth v. McClure**, 144 A.3d 970, 975 (Pa. Super. 2016). An error is harmless only if it could not have contributed to the verdict. **See id.**, at 975-976. This Court will find harmless error where the error did not prejudice the appellant, or the prejudice was *de minimis*. **See Commonwealth v. Brown**, ––– Pa. ––––, 185 A.3d 316, 330 (2018). Similarly, where "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so

insignificant by comparison that the error could not have contributed to the verdict," we will deem the error harmless. ***Id.*** (citation omitted).

***Commonwealth v. Akhmedov***, __A.3d__, 2019 PA Super 232, at *6 (Pa.Super. July 29, 2019).

In this case, the Commonwealth presented overwhelming evidence of Appellant's guilt. Both Williams and Norman Gay identified Appellant as the shooter at trial and in earlier statements to the police. The prosecution presented records from a phone that was at the location of the shooting at the time it had occurred. The phone contained selfies of Appellant and text messages sent from "Meer Meer" a few hours before the shooting occurred. N.T., 4/4/18, at 144-45.

The phone's geolocation records also showed the phone was brought back to Appellant's home after the shooting and eventually taken to a Camden hospital, where Appellant admittedly checked in with a gunshot wound to the foot. Appellant gave a fake name to the Camden medical personnel, and indicated he had been shot in Camden. However, Camden police found no evidence of a shooting in the area Appellant reported. When confronted with his phone records, Appellant exclaimed that his "life [was] over" and indicated that he would take responsibility for the murder if no one else was prosecuted. N.T., 4/4/18, at 97.

Moreover, the Commonwealth presented evidence that would allow the jury to infer that Appellant had a motive to kill the victim; Appellant admitted

the victim was a member of a rival gang who was suspected to have murdered Appellant's best friend.

As a result, any prejudice that resulted from the admission of Williams' prior statement was so insignificant in comparison to the overwhelming evidence of guilt presented at trial. Accordingly, we find Appellant's claim to be meritless and affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/21/19